UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| LINDSAY SHERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-1661 |
| | ) | Judge Aleta A. Trauger |
| CBRE GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment filed by the defendant CBRE Group, Inc. ("CBRE") (Docket No. 31), to which the plaintiff Lindsay Sherman has filed a Response in opposition (Docket No. 39), and CBRE has filed a Reply (Docket No. 41). For the reasons discussed herein, CBRE's motion will be granted and this action will be dismissed with prejudice.

## BACKGROUND & PROCEDURAL HISTORY[1]

CBRE is a commercial real estate services company. On October 8, 2012, Ms. Sherman was hired as a Finance Manager for CBRE. She was assigned to handle commercial real estate accounts for CBRE client Nissan North America ("Nissan"), including managing budgeting and forecasting processes, financial reporting to Nissan, and keeping her supervisor at CBRE – initially Rob Jacobs and, later, Vincent Dunavant, who oversaw the Nissan account – informed on all aspects of the financial operation. Ms. Sherman was not employed by Nissan, but she was

---

[1] The facts contained in this section are drawn from the undisputed facts in the record and Ms. Sherman's testimony in her June 29, 2015 deposition, attached in its entirety to her Response brief (Docket No. 39, Exs. 5-9) (the "Sherman Dep.").

1

based in Nissan's North American headquarters in Franklin, Tennessee, where CBRE management working on the Nissan account worked alongside Nissan employees. On August 14, 2013, Ms. Sherman was terminated from her position by CBRE. This action arises from Ms. Sherman's allegations that her termination was in retaliation for complaints she made about practices at CBRE and was due to either her gender or her pregnancy.

Ms. Sherman initially filed this action on August 14, 2014. (Docket No. 1.) On October 6, 2014, CBRE filed a Motion to Dismiss for failure to state a claim and, on October 20, 2014, Ms. Sherman filed a Response along with an Amended Complaint (Docket No. 12), which is the current operative pleading (the "Complaint"). As a result, on October 21, 2014, the court issued an Order rendering moot CBRE's Motion to Dismiss. (Docket No. 13.)

The Complaint brings the following causes of action: 1) violation of the anti-retaliation provision of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A; 2) violation of Tennessee common law prohibiting retaliation for whistleblowing; 3) violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"), based on allegations that CBRE discriminated against Ms. Sherman based on gender; 4) violation of Section 701(k) of Title VII, the Pregnancy Discrimination Act, based on allegations that CBRE terminated Ms. Sherman because she was pregnant; 5) violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401 *et seq.* (the "THRA"), based on allegations of gender discrimination; and 6) violation of the THRA based on allegations of pregnancy discrimination.

On November 16, 2015, CBRE filed a Motion for Summary Judgment (Docket No. 31), along with a Memorandum in support (Docket No. 32), a Statement of Undisputed Material Facts (Docket No. 33), and a number of supporting documents (Docket Nos. 34, 35). On December 18, 2015, Ms. Sherman filed a Response in opposition (Docket No. 39), along with a

response to CBRE's Statement of Undisputed Material Facts (Docket No. 40). On January 8, 2016, CBRE filed a Reply (Docket No. 41), along with additional exhibits (Docket No. 44).

**<u>Ms. Sherman's Allegations Regarding Her Complaints About CBRE's Practices</u>**

In the Complaint, Ms. Sherman identifies two issues about which she lodged the complaints that she alleges led to her termination. The first issue relates to a pre-bill account that was established by Nissan and CBRE. It is undisputed that Nissan and CBRE mutually agreed to the establishment of this account and that it was to be used as a reserve for funds deposited by Nissan, in anticipation of future charges for services by CBRE that could then be paid directly from the account. Ms. Sherman concedes that there was nothing improper about the establishment of this account; she further concedes that CBRE did not misappropriate funds from this account or mislead Nissan with respect to its use of the account and that all funds taken by CBRE from the account were applied to services actually rendered by CBRE – or third-party vendors retained by CBRE – on Nissan's behalf. (Docket No. 39, Ex. 7, (Sherman Dep.) at 146:13-148:8.) Ms. Sherman's complaints about the pre-bill account were limited to the fact that CBRE charged certain services to the account before those services were complete, including asking third-party vendors to prepare invoices and collect payments prior to completion of their services. It is undisputed, however, that all payments were authorized by Nissan. Ms. Sherman alleges that the services were billed before completion because CBRE wanted to drain the pre-bill account before the end of its fiscal year in order to include the funds from the pre-bill account in its revenues rather than its liabilities, as money that would be owed back to Nissan if not charged. Nowhere in the record does Ms. Sherman explain how this practice violates any legal regulation nor how she reasonably believed that it did. Moreover, there is no evidence in

3

the record that Ms. Sherman ever told anyone – at CBRE or elsewhere – that she believed that CBRE's use of the pre-bill account was in any way illegal.

Ms. Sherman concedes that her complaints about this pre-bill matter were limited to two conversations, one with Mr. Dunavant and one with her mentor at CBRE, Marianne McDonald. (Docket No. 39, Ex. 6 (Sherman Dep.) at 95:11-99:4.) Her conversation with Mr. Dunavant took place in late 2012 or early 2013 and, in that conversation, Ms. Sherman told Mr. Dunavant that she did not want to set up the billing the same way in the future and again have to obtain invoices from vendors for services prior to their completion. *Id.* Ms. Sherman's conversation with Ms. Dunavant was limited to Ms. Sherman explaining to her how the pre-bill account was structured. *Id.* Ms. Sherman offers no evidence to refute the defendants' characterization of these conversations as Ms. Sherman's venting about what appears to have been a billing scenario that was difficult to administer logistically.

The second basis for the complaints that Ms. Sherman alleges led to her termination involves an error, in which CBRE overcharged Nissan for commissions on deals for which Nissan and CBRE had contractually agreed that CBRE's commissions would be reduced by a certain rebate amount. Ms. Sherman does not dispute that the overcharge itself, in the amount of approximately $175,000, was inadvertent. Her complaints focused solely on the fact that she believed CBRE had not repaid Nissan in a timely fashion and that she believed CBRE was going to wait until new commissions came in to refund the money rather than do it right away. Ms. Sherman does not put forth any evidence to suggest that CBRE withheld information from Nissan about the overcharge or any delay in repayment.[2] Ms. Sherman also does not put forth

---

[2] Ms. Sherman claims that she spoke about this matter with one manager at Nissan, a man named Mr. Delauter, and that he seemed surprised when she told him that CBRE owed money to Nissan

any evidence to show that she fully explored – or even had access to – the records documenting this overcharge and pending reimbursement.

Ms. Sherman based her complaints in this regard on one communication from an employee at CBRE named Jessica Adams who, Ms. Sherman concedes, said only that the CBRE *brokers* who received the inflated commissions had not paid back the money they owed to *CBRE* and might not pay it back. Ms. Sherman alleges that she understood this to mean that the money would not be paid back to *Nissan*, but she does not provide any evidence to support her basis for this belief. To the contrary, on February 15, 2013, Ms. Sherman sent an email to two higher-ups at CBRE (Jessica Rober and Oden Blair), cc'ing Mr. Dunavant, stating that Nissan was not being paid for these overcharges. (Docket No. 39, Ex. 2.) In response, she was expressly told by Mr. Dunavant that the only question pending at CBRE, and delaying the issue from being resolved, was whether CBRE would require the individual brokers to repay the money, or whether CBRE would absorb the costs; he explained that there was never any question that Nissan would be reimbursed for the error. *Id*. Ms. Sherman provides no evidence to refute this explanation for the information she was given by Ms. Adams or to show that she had any basis to believe that CBRE was not planning to repay Nissan. She also provides no evidence to show that CBRE's delay in making this reimbursement – or even failure to make the reimbursement – would have violated any legal regulation or that she had reason to believe it did.

Nevertheless, several months later in August 2013, Ms. Sherman told Mr. Delauter, a manager at Nissan, that only a portion of this overcharge had been repaid to Nissan and that there

---

for commission rebates, but she admits she did not tell him what deal she was referring to. Nor does Ms. Sherman provide any evidence to show that it was Mr. Delauter's job to monitor the ongoing status of this account or that he ever indicated to her that the information about its status was unavailable to Nissan.

was still an outstanding balance owed. Following this conversation – and, according to Ms. Sherman's testimony, at Mr. Delauter's suggestion – Ms. Sherman called the Nissan whistleblower hotline to report this outstanding balance. There is no evidence in the record that anyone at CBRE was aware that Ms. Sherman made this call prior to her termination. In addition, there is no evidence in the record to show that there truly was an outstanding balance owed to Nissan at the time this call was made in August 2013, nor to explain Ms. Sherman's belief that this was true.

In the same email string from February 2013, where Ms. Sherman raised the commission overcharge issue with CBRE managers, Mr. Dunavant privately responded to her and admonished her for going over his head to a managing director at the company with this type of concern. (Docket No. 39, Ex. 2.) The record suggests that Ms. Sherman and Mr. Dunavant had an ongoing conflict about Ms. Sherman's communication style, including her bringing matters to the client's attention without first consulting with Mr. Dunavant and her complaining about Mr. Dunavant to others at CBRE. It is undisputed that Ms. Sherman also had a history of conflict with Mr. Jacobs, again apparently regarding work style and communication issues, and this is the reason she was asked to begin reporting to Mr. Dunavant instead of Mr. Jacobs.

Relatedly, in June of 2013, Mr. Dunavant gave Ms. Sherman a relatively low performance rating in the area of "R.I.S.E.," which is an acronym used by CBRE to encapsulate their company values of respect, integrity, service, and excellence. (Docket No. 39, Ex. 1.) He stated: "In addressing the issue, I've noted at times where [Ms. Sherman] may have let her frustration lead to a disrespectful confrontation or message with a fellow employee. Over time, such actions will erode credibility, undermine effectiveness and overshadow otherwise great performance." *Id*. This review was the subject of a disagreement between Ms. Sherman and Mr.

Dunavant in a meeting several days before Ms. Sherman was terminated from her position. (Docket No. 39, Ex. 8 (Sherman Dep.) at 260:3-269:23.) At this same meeting, on August 9, 2013, Ms. Sherman and Mr. Dunavan disagreed over whether Ms. Sherman was at fault for missing report deadlines and about Ms. Sherman's strained relationship with Mr. Jacobs, and Ms. Sherman told Mr. Dunavant that she didn't think Mr. Jacobs should be in a leadership position and called Mr. Dunavant a liar. *Id*. Ms. Sherman conceded that she believed the disagreements raised in this meeting would cause her to be terminated in a subsequent meeting several days later on August 14, 2013, as she was.

**Ms. Sherman's Allegations Regarding Gender and Pregnancy Discrimination**

Ms. Sherman's claims of gender and pregnancy discrimination are limited to the following narrow set of factual allegations: 1) Ms. Sherman informed Mr. Dunavant of her pregnancy in June of 2013 and, shortly thereafter, she was excluded from client meetings and some of her tasks were given to male employees; 2) there was one incident in which Mr. Dunavant became upset that Ms. Sherman was leaving work early for an afternoon appointment with her obstetrician; and 3) when Ms. Sherman was removed from the Nissan account, she was terminated entirely from CBRE, but two male CBRE employees – John Myers and Jeremy Lampton – were removed from the Nissan account and offered other positions within CBRE.

In her deposition, Ms. Sherman admits that the actual reason she believes she was excluded from client meetings is because she started questioning CBRE's practices to Mr. Jacobs, Mr. Dunavant, and Ms. McDonald. (Docket No.39, Ex. 5 (Sherman Dep.) at 36:9-37:12.) She further concedes that 1) Mr. Dunavant told Ms. McDonald in late June of 2013 that he believed Ms. Sherman could not be trusted and that it was inappropriate for Ms. Sherman to have questioned things about the Nissan account to Ms. McDonald behind his back when he had

7

the account under control and 2) this was the reason she was excluded from meetings with the client. (*Id*. at 134:5-135:25.) Finally, Ms. Sherman elaborates that her questioning that was behind her exclusion from client meetings related to certain items billed to Nissan, namely: 1) entertainment expenses, which she believed were not supposed to be charged to Nissan as per Nissan's contract with CBRE; 2) bills for management services for a particular facility that she believed may have conflicted with Nissan's position as to when CBRE began to manage the facility and what portion of the facility they were managing; and 3) charges for the full-time services of CBRE employee Stephen Songy during a period in time when, Ms. Sherman alleges, his full-time services were not authorized under Nissan's contract.

There is no evidence in the record to show that Nissan was unaware of the charges for entertainment expenses, the portion of the facility or the timing of the facility management services CBRE was charging for, or the timing of the services billed for Mr. Songy. Nor is there any evidence to suggest that CBRE attempted to withhold this information from Nissan. In addition, there is no evidence to suggest that, in issuing any of these charges that may have been subject to dispute by Nissan, CBRE engaged in any unlawful activity or that Ms. Sherman had any reason to believe they did. Moreover, Ms. Sherman does not provide any evidence that her questioning of these bills to her supervisors included any complaints that these bills might be illegal or, indeed, anything beyond what she perceived to be a difference of opinion between Nissan and CBRE as to the propriety of the charges. Further, Ms. Sherman does not allege in the Complaint or in her briefing that her inquiries about these matters were related in any way to her termination or to her retaliation claims, which she bases solely on her complaints about the pre-bill account and rebate commissions. Finally, nowhere in the record does Ms. Sherman provide any details about the male employees who she alleges took over her tasks at this time.

8

Following Ms. Sherman's termination, CBRE replaced her with another female Finance Manager, Rebecca Edwards.

As to the incident in which Mr. Dunavant allegedly became upset with Ms. Sherman for leaving work early to go to an obstetrician's appointment, Ms. Sherman does not allege that Mr. Dunavant actually made any comments about the reason for Ms. Sherman's leaving early. Rather, Ms. Sherman concedes that, in fact, his concern was about a report that Ms. Sherman was supposed to finalize and that, ultimately, he did not prevent her from going to the appointment after she assured him she would complete the report from home. (Docket No. 39, Exs. 6-7 (Sherman Dep.) at 140:12-145:3.)

With respect to Ms. Sherman's final allegation, that she was treated differently than Mr. Myers and Mr. Lampton, Ms. Sherman concedes that, immediately prior to her termination, she too was offered another position within CBRE but that she declined to accept it because it would qualify as a demotion with a loss in compensation. (Docket No. 39, Ex. 6 (Sherman Dep.) at 139:24-140:11). She expressed her lack of interest to Mr. Dunavant at the same August 9, 2013 meeting discussed above. Ms. Sherman does not provide any evidence as to whether the positions taken by Mr. Myers and Mr. Lampton had similar adverse consequences. Nor has she produced any evidence comparing the stated reasons for her termination with the reasons why Mr. Myers and Mr. Lampton were removed from the Nissan account.

## LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least

9

one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

**I.** **Retaliation Claims**

Under SOX, a publicly traded company is prohibited from discharging or discriminating against an employee based on:

> any lawful act of the employee to provide information, cause information to be provided, or otherwise assist an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders . . .

18 U.S.C. § 1514A. In order to establish a *prima facie* case of whistleblower retaliation under this statute, a plaintiff must establish that 1) the plaintiff engaged in protected activity; 2) the employer knew or suspected, either actually or constructively, that the plaintiff engaged in the protected activity; 3) the plaintiff suffered an unfavorable employment action; and 4) the protected activity was a contributing factor in the employment decision. *Rhinehimer v. U.S. Bancorp Investments, Inc.*, 787 F.3d 797, 804-05 (6th Cir. 2015). Protected activity is defined in this context as the provision of information regarding employer conduct the employee reasonably believed to constitute a violation of relevant law, as outlined in the statute. *Id.* at 806 (internal citations omitted).

> [R]easonable belief involves both a subjective component and an objective component. The subjective component is satisfied if the employee actually believed the conduct complained of constituted a violation of relevant law. Objective reasonableness is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee.

Id. at 811 (internal citations omitted).

Ms. Sherman has clearly failed to demonstrate that she engaged in any protected activity under this standard. She has not articulated anywhere in the record how it is that the business practices she alleges she complained about were illegal nor how it would have been reasonable for her, as a finance manager, to have believed these activities were illegal. Further, she has failed to demonstrate that there was any basis for CBRE to have actually or constructively known that she was engaging in protected activity, since she never once indicated in her complaints that she had a belief – reasonable or otherwise – that the practices she complained about were illegal. At most, her complaints could be construed as disagreements about management style, efficiency, and competence; but, just as there is no reasonable articulation of

11

why she might have believed that these activities were illegal, there is no evidence that CBRE would have understood her to believe as much. The only activity Ms. Sherman engaged in that could be construed in any way to evidence her belief that there may have been illegal activity going on is her phone call to the Nissan whistleblower hotline. Even the content of that phone call, however, was devoid of an expression of her belief in illegal activity, as opposed to mere complaints about inefficiency at CBRE or – at worst – CBRE's breach of its contractual agreement with Nissan. Moreover, there is no evidence in the record, that CBRE was aware of this phone call prior to Ms. Sherman's termination. For these reasons, Ms. Sherman has failed to establish, as a matter of law, two of the four elements necessary to succeed on a SOX retaliation claim – that she engaged in protected activity and that CBRE had constructive knowledge of her protected activity – and this claim will, therefore, be dismissed.

Under Tennessee common law, the elements of a whistleblower retaliation claim are: 1) an at-will employment relationship existed between the plaintiff and the defendant; 2) the plaintiff was discharged; 3) the reason for the discharge was that the employee attempted to exercise a constitutional or statutory right, or any other reason that "violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision;" and 4) that this reason was a substantial factor in the discharge. *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1031 (6th Cir. 2010). This claim essentially mirrors the SOX whistleblower retaliation claim. For the same reasons discussed above, the plaintiff has failed to show that, even if she was terminated in part for her complaints about CBRE's business practices, this violates a clear constitutional, statutory, or regulatory provision, because she has failed to show that she had a reasonable belief in the illegality of the practices she complained of, let alone that CBRE actually

committed any illegal practices. Accordingly, she has failed to establish a common law retaliation claim and this claim will be dismissed.

## II.     Discrimination Claims

In order to establish a *prima facie* case of gender discrimination under Title VII, the plaintiff must establish that she is a member of a protected class, she is qualified for her job, she suffered an adverse employment decision, and that she was replaced by a person outside of her protected class or treated differently than similarly situated non-protected employees. *See, e.g, White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008); *Fullen v. City of Columbus*, 514 F. App'x 601, 605 (6th Cir. 2013) (citing *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001)). Similarly, in order to establish a *prima facie* case of Title VII pregnancy discrimination, a plaintiff must demonstrate that she was pregnant, she was qualified for her position, she was subjected to an adverse employment decision, and there is a nexus between her pregnancy and the adverse employment decision. *Prebilich-Holland v. Gaylord Entm't Co.*, 297 F.3d 438 (6th Cir. 2002). The THRA is a Tennessee statute that tracks Title VII and is analyzed in the same way. *See Regnier v. Metro. Gov. of Nashville*, 2006 W.L. 1328937 (Tenn. Ct. App. May 11, 2006) ("It is clearly the law in Tennessee that federal case law on Title VII and related civil rights statutes may be used to interpret the THRA since the stated purpose and intent of the THRA is to execute the policies embodied within the federal anti-discrimination acts) (citing TENN. CODE ANN. § 4-21-101)(a)(1)); *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 757-58 (6th Cir. 2012).

Ms. Sherman is unable to establish a *prima facie* case of gender or pregnancy discrimination. First, after her termination, she was replaced by a woman. The only allegations she raises regarding being treated differently than male employees are her allegations that Mr.

13

Myers and Mr. Lampton were offered other positions within CBRE when removed from the Nissan account and she was not. As explained above, however, she does not provide any evidence to suggest that Mr. Myers and Mr. Lampton were removed from the Nissan account for the same reasons she was removed; nor does she provide any details about the positions to which they moved. She concedes that, several days before her termination, she was also offered an opportunity to pursue another position within CBRE, but she declined. Ms. Sherman is similarly unable to establish any nexus between her pregnancy and any adverse employment actions taken against her. She has conceded that her pregnancy was not the reason behind her exclusion from client meetings, nor was it the reason for Mr. Dunavant's apparent concern about her leaving work early on the one occasion she cites where there was a conflict over an appointment with her obstetrician. Further, in her briefing, Ms. Sherman appears to concede that neither her gender nor her pregnancy were reasons for her termination. In arguing that she has established a *prima facie* case of Title VII discrimination and that any non-discriminatory motives for her termination offered by CBRE are pretext, Ms. Sherman states only that she "has outlined that she was retaliated against for her reporting of SOX violations by [CBRE]." (Docket No. 39, p. 19.) It appears, then, that Ms. Sherman admits that she was terminated for conflict with her supervisors, which may have included her complaints about their practices on the Nissan account, complaints which – for the reasons discussed above – do not give rise to a retaliation claim and, further, certainly cannot support a Title VII claim.

Finally, Ms. Sherman does not dispute that she had ongoing conflict with her supervisors at CBRE, a negative performance evaluation, and an argument with Mr. Dunavant about these issues, during which she called him a liar. She does not provide any evidence to suggest that these were not sufficient reasons to render her unqualified for her position that warranted her

termination. For these reasons, the court finds that Ms. Sherman has failed to raise even a *prima facie* case under Title VII or the THRA and these claims will be dismissed.

## CONCLUSION

For these reasons, CBRE's Motion for Summary Judgment will be granted and Ms. Sherman's claims will be dismissed with prejudice.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge